IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOBE DANGANAN, on behalf of himself and all others similarly situated, ) ) ) | Civil Action No. 15-1495 |
| Plaintiff, ) ) | |
| v. ) ) | Chief United States Magistrate Judge Cynthia Reed Eddy |
| GUARDIAN PROTECTION SERVICES, ) ) ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Pending before the Court is a renewed motion to dismiss, or in the alternative, motion to strike class claims ("motion to dismiss") filed by Guardian Protection Services ("Guardian" or "Defendant") (ECF No. 57). For the reasons that follow, the motion to dismiss will be granted and the motion to strike will be denied as moot.

I. **Procedural History and Facts as Alleged**

Plaintiff Jobe Danganan ("Plaintiff") initiated this action on behalf of himself and a putative nationwide class of similarly situated individuals in the Court of Common Pleas of Philadelphia, Pennsylvania, seeking relief under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, et seq. ("UTPCPL") (Count I) and Pennsylvania's Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1, et seq. ("FCEUA") (Count II). After it was filed, Guardian timely removed the case to the United States District Court for the Eastern District of Pennsylvania and then successfully moved for it to be transferred to the United States District Court for the Western District of Pennsylvania where it has been assigned to the

1

undersigned.[1]

Defendant's first motion to dismiss was filed on December 11, 2015 (ECF No. 32), and was granted on July 25, 2016. (ECF No. 43). The Court's decision to dismiss this action was premised on then-existing case law which supported the proposition that non-residents of Pennsylvania such as Plaintiff lacked standing to pursue claims under the UTPCPL and FCEUA in the absence of a "sufficient nexus" to Pennsylvania. Plaintiff appealed, and the United States Court of Appeals for the Third Circuit certified the question of nonresident standing to the Pennsylvania Supreme Court. The Pennsylvania Supreme Court clarified that while jurisdictional principles and choice-of-law rules can bar UTPCPL claims by those without any connection to Pennsylvania, mere non-residence would not categorically prohibit such claims against a Pennsylvania business arising from transactions that occurred outside of Pennsylvania. *Danganan v. Guardian Prot. Servs*., 179 A.3d 9, 16–17 (Pa. 2018). The United States Court of Appeals for the Third Circuit thereafter reversed our decision and remanded this case for further proceedings on August 28, 2018. *Danganan v. Guardian Protection Services*, 742 Fed. Appx. 634 (August 6, 2018).

On September 12, 2018, the court conducted a telephonic status conference, and entered an initial case management order. (ECF Nos. 50, 51). On September 28, 2018 Defendant filed the instant renewed motion to dismiss or alternatively, motion to strike class claims. (ECF No. 57). The issues raised in the renewed motion were previously raised by Guardian in its original motion to dismiss but we did not address them because the we found we lacked jurisdiction. The renewed motion has been fully briefed and is ripe for disposition.

---

[1] By consent of the parties, and pursuant to 28 U.S.C. § 636(c), the parties have voluntarily consented to have the undersigned conduct any and all proceedings herein, including the authority to enter final judgment, with direct review by the United States Court of Appeals for the Third Circuit. (ECF Nos. 27, 29).

The allegations in the Complaint (ECF No. 1-1) ("Compl.") are as follows. Plaintiff is an individual who currently resides in San Francisco, California. (Compl. at ¶ 8). In 2013 through September 2014 he resided in Washington, D.C. where he entered into a contract with Guardian ("the contract") entitled Authorized Dealer Sales and Monitoring Agreement. (Compl. at ¶ 8). The contract is attached to the Complaint as Exhibit A. (ECF No. 1-1 at 21-37). Defendant is a Pennsylvania corporation with offices in Philadelphia and with a principal place of business in Warrendale, Pennsylvania. (Compl. at ¶ 9). Defendant installs security systems in residential and commercial properties and provides "burglary, fire and medical emergency" monitoring services for subscribers around the United States. (Compl. at ¶ 2, 18). All customers in the United States who seek home protection services from Guardian are provided with a standard form contract which establishes that all claims must be adjudicated in Pennsylvania and under Pennsylvania law. (Compl. at ¶ 10). It is further alleged that the contract includes numerous one-sided terms, including provisions that function as unlawful contractual penalties. Guardian claims that the form contract authorizes it to charge its customers for services that have been promised but not provided, including services not provided because the customer has moved, sold his or her house, or otherwise terminated the contract. (Compl. at ¶ 11).

In Section "C" of the contract, entitled "Installation and Service Types" Plaintiff herein opted for home protection monitoring services. The contract provides that, "For services identified in 'C' above **the initial term of this Agreement is five (5) years** commencing on the day service begins and will, to the extent permitted by law, automatically continue for five (5) year terms thereafter unless cancelled by either You or Us in writing at least thirty (30) days before the end of the initial term or any renewal term." (Contract, Section E) (emphasis added). Furthermore, the contract provides:

> **SUSPENSION OR CANCELLATION OF SERVICES**. . . . If service is cancelled or this Agreement expires or is terminated for any reason, you authorize Us to remotely disconnect the Panel from the Center and/or enter Your Premises to disconnect the System from Our monitoring equipment. If service is suspended because You have failed to pay the charges set forth herein, and You ask Us to reactivate the System, You will pay, in advance, Our then prevailing re-connection fee.

(Contract, ¶ 11). The contract further provides:

> **TERMINATION; DEFAULT**. You authorize Us and Our Authorized Dealer to investigate independently and/or share Your credit record and to report Your payment performance under this Agreement to credit agencies and credit reporting services. If You fail to make any payment when due . . . We may discontinue installation, monitoring and service, terminate this Agreement and recover all damages to which We are entitled . . . You also agree to pay for any and all collection agency fees, attorneys fees and related costs, whenever this matter is referred to collection and whether or not a suit is filed. We may impose a monthly late fee on all payments more than thirty (30) days past due in an amount equal to $5.00 each until paid, or the maximum amount permitted by Pennsylvania law, whichever is less. The provisions of this Agreement that apply to any claim or suit will survive the cancellation, termination, or expiration of this Agreement. . . . **Your obligations under this Agreement continue even if You sell or leave the Premises.**

(Contract ¶ 12) (emphasis added).

Plaintiff further alleges that customers who refuse to pay for services that Guardian has stopped providing are sent to collections, and Guardian reports adverse payment information to the credit reporting bureaus. (Compl. ¶ 14). The amounts charged by Guardian bear no relationship to any amount lost or cost incurred by Guardian due to a customer's termination of services and this, Plaintiff alleges, constitutes an unlawful contractual penalty prohibited under Pennsylvania law. (Compl. ¶ 15). After customers terminate the contract with Guardian, and Guardian stops providing home protection and monitoring services, Guardian continues billing its customers for services it is not providing. (Compl. ¶ 16). When a customer disputes that payment is owed, Guardian bills the customer and threatens to report the customer as delinquent

for failing to make payment. When a customer pays Guardian under protest or indicates that payment has been made in full, Guardian continues to bill the customer. (Compl. ¶ 17).

Plaintiff entered into the contract with Guardian in April 2013. The contract provided that, in exchange for a one-time installation fee, Guardian would install a security system in his home, and provide security monitoring services for a "monthly services fee" of $44.95. (Compl. ¶ 19) (emphasis added).

In September 2014, Plaintiff moved from Washington, D.C. to San Francisco for work. (Compl. ¶ 21). In November, 2014, Plaintiff sold his house in Washington, D.C., and then cancelled his service with Guardian on November 17, 2014, by providing Guardian with both written and verbal notice of cancellation, effective November 18, 2014. (Compl. ¶ 22, citing Exhibit B, ECF No. 1-1 at 39). Despite the fact that Plaintiff had cancelled his service, and that he neither owned the house, nor lived in it, Guardian continued to bill him for home protection and monitoring services. (Compl. ¶ 24, citing Exhibit C, ECF No. 1-1 at 41). Thereafter, Plaintiff complained on numerous occasions to Guardian about its continued billing and collection efforts; Guardian ultimately offered Plaintiff the ability to buy out his contract for $535. Further, in response to his complaints, Guardian asked Plaintiff to sign a "disable letter" that purports to allow Guardian to cease providing services, but would still require payment from Plaintiff. Plaintiff refused to sign the letter. (Compl. ¶ 25, citing Exhibit D, ECF No. 1-1 at 43).

Concerned Guardian would send his bill to a collection agent, or make an adverse report on his credit report, Plaintiff continued to pay Guardian. (Compl. ¶ 26). In February 2015 Guardian billed Plaintiff $148.95, including $44.95 for "Security Services" between March 5, 2015 and April 4, 2015, and also billed him for a "Service Charge". (Compl. ¶ 27, citing Exhibit E, ECF No. 1-1 at 45). On February 12, 2015 Plaintiff paid $49.65 to Guardian by check, which

5

Guardian cashed on February 23, 2015. Plaintiff wrote on the check, "paid in Full. Service Terminated 11/18/14." (Compl. ¶ 28, citing Exhibit F, ECF No. 1-1 at 47). In March 2015, Guardian billed Plaintiff $148.95, including $44.95 for "Security Services" between March 5, 2015 and April 4, 2015. Guardian also billed Plaintiff for a "Service Charge." (Compl. ¶ 29, citing Exhibit G, ECF No. 1-1 at 49). In March 2015, Plaintiff paid $148.95 to Guardian under protest; the check is attached to the Complaint as Exhibit H. (Compl. ¶ 30, ECF No. 1-1 at 51). In April 2015, Guardian billed Plaintiff $201.60, including $44.95 for "Security Services" between April 5, 2015 and May 4, 2015. The bill included "late fees" and "service charges." (Compl. at ¶ 31, citing Exhibit I, ECF No. 1-1 at 53).

Consumers have complained to Guardian about the billing and collection practices, including its continued demand for payment and collection of money from consumers after security and monitoring services have been cancelled. (Compl. ¶ 32). Plaintiff alleges that Guardian's standard form contract is replete with one-sided and unlawful terms that are intended to disadvantage and/or mislead consumers, create ambiguity, or leave the consumer with the impression that they have waived or limited certain rights, including a shortened statute of limitations and right to jury trial. (Compl. ¶ 34).

Plaintiff brings this action in his own right, and on behalf of all others similarly situated. He seeks to represent all individuals who reside in the United States, who entered into contracts for home security and/or monitoring services with Guardian, and who cancelled the services or terminated their contract, and paid money following the cancellation of services or termination of the contract. (Compl. ¶ 35). He seeks a declaratory judgment that the UTPCPL was violated, an injunction ordering Guardian to refrain from any further illegal conduct, an injunction ordering Guardian to comply with the UTPCPL and ordering it to adopt appropriate policies.

Plaintiff also requests monetary damages, attorney's fees and costs.

**II.     Standard of Review**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and must be "sufficient to state a claim for relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.... Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (*quoting Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr, Corp.*, 809 F.3d

7

780 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679.

"Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, the court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997).

### III. Discussion

Guardian argues that the Complaint fails to state a claim upon which relief can be granted in that Plaintiff misinterprets the plain language of the agreement, he has not plead that he justifiably relied upon the alleged deceptive conduct, and he has failed to allege an ascertainable loss. Guardian also moves to strike the class claims.

Count I alleges violation of the UTPCPL and Count II alleges violations of the FCEUA. The elements of a UTPCPL claim are: 1) a deceptive act, 2) justifiable reliance, 3) causation, and 4) damages. *Kern v. Lehigh Valley Hosp.*, 108 A.3d 1281, 1290 (Pa. Super. 2015). The FCEUA,

which prohibits creditors from using any "false, deceptive or misleading representation or means in connection with the collection of any debt" does not have its own remedy provision; rather, it is enforced through the statutory remedy provision of the UTPCPL. *Salvati v. Deutsche Bank. Nat. Trust Co.*, 575 F. Appx. 49, 57 (3d Cir. 2014).

The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201–3. "The statute creates a private right of action in persons upon whom unfair methods of competition and unfair or deceptive acts or practices are employed and who as a result, sustain an ascertainable loss." *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 190 n. 4 (Pa. 2007) (citing 73 P.S. § 201–9.2). The Pennsylvania Supreme Court has long instructed that the UTPCPL be construed liberally in order to effectuate its primary purposes of preventing fraud and deceptive practices. *See Com., by Creamer v. Monumental Prop., Inc.,* 329 A.2d 812, 816 (Pa. 1974). Section 201–2(4) lists several specific "unfair methods of competition" and "unfair or deceptive acts or practices," and also includes a catchall provision that prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." Id., § 201–2(4)(i)–(xxi). Plaintiff herein relies upon the catchall provision of the UTPCPL. (Compl. at p. 15).

Guardian argues that Plaintiff's Complaint is premised upon the erroneous assumption that he had a unilateral right to terminate the contract at any time during the initial five-year term and that Guardian improperly attempted to collect fees from him after he provided notice of cancellation. Plaintiff argues that the terms of the contract are clear that he had the contractual right to cancel the contract, and that should we find otherwise, i.e. that the terms are ambiguous, the jury should be the final decisionmaker. He also argues that as a contract of adhesion, the contract should be strictly construed against the drafting party, Guardian. *Thibodeau v. Comcast*

9

*Corp.,* 912 A.2d 874, 882 (Pa. Super. 2006).

Thus, although Plaintiff is not suing for breach of contract, because he alleges the contract itself is misleading and creates ambiguities we must interpret the contractual terms,[2] which are governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. (Contract ¶¶ 17, 19). Pennsylvania rules of contract interpretation require this Court to "ascertain and give effect to the intent of the contracting parties." *Walsh/Granite JV v. HDR Eng'g, Inc.,* No. CV 17-558, 2019 WL 1382957, at *11 (W.D. Pa. Mar. 27, 2019), citing *Murphy v. Duquesne University of The Holy Ghost*, 565 Pa. 571, 590-591, 777 A.2d 418 (Pa. 2001). Such intent is to be determined from reading the entire agreement as a whole and "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy*, 565 Pa. at 591, 777 A.2d 418 (citations omitted). "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* (quotation omitted). If the terms of a contract are unambiguous, the plain meaning of the terms of the agreement will be enforced. *Id.*

Pennsylvania law recognizes two types of ambiguities—patent and latent. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). "While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Id.* at 93 (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d at 614). If the terms of a contract are ambiguous, extrinsic and parole evidence is admissible to interpret the ambiguous portions of the contract. *Murphy*, 565 Pa. at 591. "A contract contains an ambiguity if it is reasonably susceptible of different

---

[2] We need not address certain allegations in the complaint which are extraneous to the issue at hand, for example, the contractual terms relating to the statute of limitations and waiver of right to jury trial, because plaintiff has not alleged these terms caused him to suffer a loss.

constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.* "The 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." *Trizechahn Gateway LLC v. Titus*, 601 Pa. 637, 653 (Pa. 2009) (citing *Murphy*, 565 Pa. at 591).

As noted above, the contract provides that, "For services identified in 'C' above the initial term of this Agreement is five (5) years commencing on the day service begins and will, to the extent permitted by law, automatically continue for five (5) year terms ***thereafter*** unless cancelled by either You or Us in writing at least thirty (30) days before the end of the initial term or any renewal term." (Compl. Ex. A) (emphasis added). Although not alleged in the Complaint, Guardian its brief clarifies that, as is reflected in the document itself, the contract provides in its "relocation guarantee" that in the event the purchaser moves, he can transfer the services to his new location, or request that Guardian transfer the Agreement and services to the residence's new owner/renter. (Contract, ECF No. 1-1 at 32).

The plain language of the contract makes it clear that Plaintiff could avoid automatic *renewal* of the agreement by giving thirty days' notice prior to the end of the five-year term, but he could not cancel the contract during the initial term. Section E is not ambiguous and its meaning is readily understood without other information. It provides that the services would be rendered for the initial five-year term, and would renew for successive five-year term unless cancelled at least thirty days prior to the renewal date. *See, e.g., Airgas-E v. GT&S, Inc.*, C.A. 5:08-cv-318, 2010 WL 11561101 (E.D. Pa. Jan. 22, 2010) (holding similar contract language unambiguous when it stated the initial term of agreement for ten years could *thereafter* be

11

renewed on annual basis upon ninety days' notice of intent to terminate). Plaintiff's reliance on *Boat Dealers' Alliance, Inc. v. Outboard Marine Corp*., 182 F.3d 619 (8th Cir. 1999) is inapposite, not only for obvious reasons, i.e. it is not binding on courts within this circuit and it applies the law of the state of Minnesota, but also because in that case, the contract provided each party with a right to terminate without cause if written notice was provided not less than ninety days prior to an "anniversary date;" it provided that after the initial period of not less than five years, the agreement would continue from year-to-year. *Id.* at 620-621.

With the clear text of the contract, and the lack of allegations that Guardian's conduct somehow lead plaintiff to believe otherwise, there are insufficient allegations that support the UPTPCL and FCEUA violations. Because private claims under the statutes require justifiable reliance, and Plaintiff having failed to allege that he relied on Guardian's deceptive conduct, he has failed to state a claim. He has not alleged, for example, that Guardian led him to believe he had the right to terminate the agreement unilaterally when he moved. Rather the uncontroverted documents attached to the Complaint, on which Plaintiff relies (and therefore are subject to our consideration in deciding the motion to dismiss) show that Guardian took the position he did not have the right to unilaterally cancel. (Compl. ¶ 22, citing Exhibit B, ECF No. 1-1 at 39; (Compl. ¶ 25, citing Exhibit D, ECF No. 1-1 at 43).

The plain language of the contract and the correspondence clearly advised Plaintiff his payment obligations continued despite his attempt to terminate. On November 17, 2014, Guardian wrote to Plaintiff and notified him that "[t]his confirms your request that the 24-hour monitoring of your security system be discontinued" but that "**[t]his document serves only to provide information regarding service provided and does not alter any of the terms or conditions of the existing monitoring agreement in any way**." (ECF No. 1-1 at 39). Guardian

sent another letter to Plaintiff on January 21, 2015, and again emphasized that **"[t]his document serves only to disconnect the monitoring service at the above named address. It is not intended to terminate your existing agreement, all terms and conditions, including your financial obligations under your monitoring agreement, continue to be in full force and effect**." (ECF No. 1-1 at 43). There is no allegation that Plaintiff paid Guardian in reliance on any promise that said payment would satisfy his entire debt; Plaintiff alleges Guardian offered the option of a buy-out of the contract for $525, which he refused. Compl. ¶ 25.

Plaintiff cites to *Hall v Equifax Info Servs. LLC*, 204 F.Supp.3d 807, 812 (E.D. Pa. 2016), in which the court denied a motion to dismiss UTPCPL claims. In *Hall,* plaintiff was injured and treated at a hospital, incurring medical bills. He entered into a written agreement that a sum certain would satisfy his medical debt with the hospital. After plaintiff's personal injury lawsuit was adjudicated, he paid his debt in the agreed upon amount to the hospital, but the hospital continued to attempt to collect the debt, later assigning the debt to a debt collector which began its own collection attempts and went so far as to report the debt as unsatisfied to credit reporting agencies. *Id*. at 809. The debt collector continued to consider the account open and refused to stop reporting his debt as paid. Plaintiff in the case at bar argues *Hall* applies because he has alleged that Guardian demanding payment (misrepresenting it was owed), and that he has paid *as a result of* the demand. However, unlike the plaintiff in *Hall,* Plaintiff has not alleged he made a payment to Guardian in reliance upon its promise it would satisfy his entire debt. Plaintiff's reliance on *Hall* is therefore misplaced. In *Hall* the court specifically noted that the hospital had agreed in writing that his debt would be satisfied and his account balance would be zero, and relying upon that misrepresentation, he made a payment to the hospital, and the debt collection efforts continued. In denying the motion to dismiss the UPTCPL claim, the court emphasized

13

that Hall had paid his debt in reliance on the written representation. Indeed, Plaintiff herein even alleges Guardian tried to negotiate an agreement that the debt would be satisfied if plaintiff bought out the contract for $525, but plaintiff refused the offer. (Compl. ¶ 25).

We are also guided by the holding in *Hunt v. U.S. Tobacco Co*., 538 F3d 217 (3d Cir. 2008) in which the court noted that justifiable reliance requires reliance on defendant's deceptive conduct, not merely that there was a causal connection between the misrepresentation and the harm. *Id*. at 222. Plaintiff attempts to differentiate between post-contract performance and pre-contract conduct, but fails to provide binding precedent in that regard; *Hunt* requires more than a causal connection.

We reject the contention that Guardian "deceptively misconstrues the contract." The contract sets forth in one section the terms and conditions under which services could be suspended, cancelled, and/or reactivated (Contract ¶ 11) while in another section relating to termination, the contract sets forth remedies available to Guardian in the event of default and conditions under which it could terminate the agreement. (Contract ¶ 12). The contract provides that in the event the purchaser moves, he or she could transfer the services to his or her new location or request the services and agreement be transferred to the residence's new owner or renter. Moreover, Guardian preserves its right in the contract to pursue collection practices, but the contract is not deceptive in that regard, and plaintiff has not alleged that Guardian acted or represented otherwise. Under the clear terms of the contract, it had the right to pursue payment through lawful channels when it continued to be willing and able to provide monitoring services as promised. As noted above, the plain language of the agreement and correspondence expressly advised Plaintiff that his payment obligations would continue despite his attempt to terminate. In sum, as alleged, this does not constitute deceptive conduct which creates a

likelihood of confusion or misunderstanding, and again, he does not suggest he relied upon the letter to his detriment. *Conquest v. WMC Mortgage Corp.,* 247 F.Supp.3d 618, 647-48 (E.D. Pa. 2017) (granting motion to dismiss under the UTPCPL on the grounds that letter sent to plaintiff were consistent with the terms of the mortgage).

For all of these reasons, Count I will be dismissed for failure to state a claim under the UTPCPL.

Furthermore, to the extent plaintiff alleges violations of the FCEUA at Count II, as noted above, such private actions are enforceable under the UTPCPL and cannot be brought as a separate cause of action. *See Parker v. Nationstar Mortgage LLC*, No. 2:15-cv-874, 2015 WL 6472223, at *8 (W.D. Pa. Oct. 27, 2015). Plaintiff argues that because he wrote "Paid in Full" on the back of one of his checks to Guardian, and the check was cashed, the entire contract was terminated under the theory of accord and satisfaction and therefore constitutes a violation of FCUEA. Yet, as defendant notes, accord and satisfaction is an affirmative defense, rather than a cause of action. *Castle Cheese, Inc. v. MS Produce, Inc*., C.A. 04-878, 2008 WL 4372856, at *18 (W.D. Pa. Sept. 19, 2008). Moreover, Plaintiff has not alleged factual content that is sufficient to state a claim that is plausible on its face, specifically as to any false, deceptive or misleading misrepresentations made by Guardian. Accordingly, Count II will be dismissed.

Lastly, Guardian moves to strike Plaintiff's class claims pursuant to Federal Rules of Civil Procedure 12(f) and 23(d)(1)(D). Said request will be denied as moot.

"Leave to amend should be freely given when justice so requires, including for a curative amendment unless such an amendment would be inequitable or futile." *Free Speech Coalition, Inc. v. Attorney General of United States*, 677 F.3d 519, 545 (3d Cir. 2012). A complaint may be dismissed without leave to amend when it is "clear from the face of the complaint that the

deficiencies cannot be cured." *Turner v. Spaley*, 501 Fed. App'x. 101, 102 n.1 (3d Cir. 2012). Plaintiff appears to only seek leave to amend as to the class allegations, rather than as to specific areas of concern raised in the motion to dismiss as to Counts I and II. (ECF No. 64 at 24, n. 10). We have concluded Plaintiff has failed to state any plausible claims for relief. For the reasons given above, the Court finds that it is "clear from the face of the complaint that the deficiencies cannot be cured." The factual allegations are not sufficient to state a claim for relief that is plausible, and do not nor could not support a theory that defendant acted in violation of the statutes. Any amendment would be futile. For these reasons, the Court will not grant Plaintiff leave to amend.

### IV. Conclusion

Therefore, the Complaint will be dismissed with prejudice by separate Order filed contemporaneously herewith.


Dated: June 13th, 2019.

By the Court:

*/s/ Cynthia Reed Eddy*
Cynthia Reed Eddy
Chief United States Magistrate Judge


cc: all counsel of record via CM-ECF

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOBE DANGANAN, on behalf of himself and all others similarly situated, | ) ) ) | |
| | ) | Civil Action No. 15-1495 |
| Plaintiff, | ) ) | |
| v. | ) ) | Chief United States Magistrate Judge Cynthia Reed Eddy |
| GUARDIAN PROTECTION SERVICES, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, to-wit, this 13th day of June, 2019, it is hereby ORDERED that the Motion to Dismiss filed by Guardian Protection Services (ECF No. 57) is GRANTED, the Complaint is dismissed with prejudice, and the Motion to Strike is denied as moot.

/s/ *Cynthia Reed Eddy*
Cynthia Reed Eddy
Chief United States Magistrate Judge

cc: all counsel of record via CM-ECF